J-S37032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.R., MOTHER | : | |
| | : | |
| | : | No. 1432 EDA 2022 |

Appeal from the Order Entered May 3, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000662-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.R., MOTHER | : | |
| | : | |
| | : | No. 1433 EDA 2022 |

Appeal from the Decree Entered May 3, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000200-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: T.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.R., MOTHER | : | |
| | : | |
| | : | No. 1434 EDA 2022 |

Appeal from the Order Entered May 3, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000663-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: T.E.G., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S37032-22

APPEAL OF: C.R., MOTHER

. . . . . . . . . . . . .

:   No. 1435 EDA 2022

Appeal from the Decree Entered May 3, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000201-2022

BEFORE: BOWES, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY OLSON, J.: **FILED DECEMBER 6, 2022**

In this consolidated appeal,[1] Appellant, C.R., ("Mother") appeals from the May 3, 2022 Decrees terminating her parental rights to her dependent children, T.G. (also known as T.E.G., Jr.), a male child born September 2005, and J.G. (also known as J.W.G.), a male child born June 2019, (collectively, "the children"),[2] pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[3] Mother also appeals from the May 3, 2022 permanency review orders that changed the permanent placement goal for T.G. and J.G. to a goal of adoption. We affirm.

The trial court provided the following factual and procedural history:

---

[1] In a September 8, 2022 *per curiam* order, this Court consolidated the four appeals *sua sponte*.

[2] For purpose of our review, we shall refer to the children as T.G. and J.G.

[3] On May 3, 2022, in separate decrees, the trial court also terminated the parental rights of T.E.G., Sr., the biological father of T.G. and J.G., ("Father"). Father is not involved in this appeal.

- 2 -

Mother gave birth to T.G. [in] September [] 2005. . . . Mother gave birth to J.G. [in] June [] 2019. . . . [In] June [] 2019, the Philadelphia[, Pennsylvania] Department of Human Services [("DHS")] received a general protective services [("GPS")] report which alleged [the following:] Mother gave birth to J.G. at [a Philadelphia hospital in] June [] 2019[, and] that J.G. was born weighing 6 pounds and 11 ounces with an Appearance, Pulse, Grimace, Activity, and Respiration [("APGAR")] reading of 8[ out of ]8[.] J.G. initially tested negative for opiates but later became sick and began to show withdrawal symptoms[.] J.G. was [placed] in the [hospital's] neonatal intensive care unit [("NICU").] J.G. has a sibling in the family's home, T.G., who has Downs Syndrome. The [GPS] report further alleged that Mother had no prenatal care and tested positive for marijuana and oxycodone[.] Mother stated that she was prepared to care for J.G. at home and had all the essential [] items for J.G[.] Mother's support system [was] J.G.'s maternal grandparents, but they resided in New Jersey[.] Mother stated that she was using marijuana to treat her seizure disorder[.] Mother and J.G. were not bonding well[,] and [] Mother had to be encouraged to visit J.G. []

On June 20, 2019, J.G. was discharged from [the Philadelphia hospital] to the care of Mother and [] Father[.] On June 21, 2019, DHS visited the family's home. DHS determined that J.G. was safe at that time.

On August 6, 2019, DHS [again] visited the family's home. Mother advised DHS that J.G. [had] issues with digesting his formula and she had been taking him to his physician. DHS advised Mother of the importance of attending [to] J.G.'s medical appointments. DHS recommended that Mother receive substance abuse treatment.

On September 3, 2019, DHS received a GPS report which alleged that on August 13, 2019, Mother and Father were involved in a verbal altercation. [A]s a result of the altercation, Father asked Mother to leave the home, and [] when Mother attempted to leave the home, Father grabbed Mother and dragged her back into the home. []

On September 9, 2019, DHS visited the family's home and met with Mother[. Mother] stated that she and Father had an altercation and he asked her to leave the home. She stated that she was [] outside the home on her bicycle, not in sight of the

children, when Father grabbed her off the bicycle to prevent her from leaving. Mother admitted that the children [] missed medical appointments. Mother stated that Father was not helping with the care of the children, or with household chores. DHS advised Mother that Community Umbrella Agency [("CUA")[4]] services would be implemented in the home to assist with the children's care.

On September 11, 2019, DHS received a supplemental report which alleged that there were domestic violence concerns with Mother and Father[. The report detailed that] a few weeks earlier, Father was running up and down the street while pushing J.G.[,] and that Mother [] moved out of the home.

On September 25, 2019, In-Home Services [("IHS")] were implemented in the home through Asociacion [] Puertorriquenos en Marcha [("APM").[5]]

On October 7, 2019, CUA visited the family's home. CUA recommended that Mother and Father attend a drug and alcohol treatment program. Father stated that he did not have time to attend treatment and then left the meeting. CUA stressed to

_____

[4] We note that, generally, CUAs

> are community-based agencies that are responsible for the provision of direct case management services to families in their designated region. The CUAs ensure that local solutions and resources are more accessible to children and families. They develop connections to formal and informal neighborhood networks that can strengthen and stabilize families. In addition, they are responsible for recruitment and retention of foster and adoptive parents in the neighborhoods where children live.

*See* https://bethanna.org/about/community-umbrella-agency/ (last visited, Nov. 16, 2022).

[5] We note that APM is "a Latino-based health, human services, community and economic development non-profit organization serving the Philadelphia area[ and] committed to helping all families, regardless of background, achieve their greatest potential." *See* https://apmphila.org/ (last visited Nov. 16, 2022).

Mother about the need for J.G. and T.G. to attend their medical appointments.

[On] October 17, 2019, DHS visited the family's home, and spoke with Father[, who] admitted that he [] grabbed Mother while she was on her bicycle because she was leaving with J.G.'s baby clothes. Father stated that Mother had been residing in the home [only on a periodic basis] and [] that he believed [] she needed mental health treatment. Father advised DHS that he learned on October 16, 2019, that Mother was at [a Philadelphia hospital] possibly for mental health treatment.

On October 18, 2019, DHS visited Mother at [the Philadelphia hospital]. Mother advised DHS that she was having black-out episodes with [] no recollection of what had occurred. She also expressed that people at the hospital were trying to kill her. DHS learned that when Mother was admitted to [the hospital] she tested positive for fentanyl, oxycodone, and amphetamines, and that she [] attempted to smuggle drugs into the hospital.

On October 18, 2019, an initial single case plan [("SCP")] was created. The objectives for Mother were to ensure that the children's medical and dental needs were being met; to ensure that T.G. attended school daily and on time; and to participate in [a] drug rehabilitation program[, and once] enrolled [] adhere to all recommendations. []

On October 24, 2019, CUA was scheduled to visit the family's home but was advised by Father that he and the [children] were temporarily residing with his brother because Mother had a Protection from Abuse [("PFA")] Order [filed] against him. Father confirmed that he and Mother had still not enrolled in drug and alcohol and domestic violence treatment [programs].

On October 31, 2019, CUA visited the family home and saw Father and [the children.] Father advised CUA that the PFA [order] against him was lifted[,] and a PFA [order] was granted for him against Mother. The [trial] court [] allowed Mother to be in the home that day to gather her belongings. Mother stated that she would find a shelter in which to reside if she could not find other accommodations. Father and Mother advised CUA that they had not enrolled in drug and alcohol and domestic violence treatment [programs].

On November 7, 2019, CUA visited the family home and saw Father and [the children.] Father advised CUA that he was unaware of Mother's whereabouts.

On November 14, 2019, CUA visited the family's home and saw Father[ and the children.] Father advised CUA that Mother had not been residing at the home and that J.G. [] missed his medical appointment on November 8, 2019.

On November 21, 2019, CUA visited the family's home and saw Father[ and the children.] Father advised CUA that Mother continued to receive Women, Infants, and Children [("WIC")] benefits and food stamps but provided little food for the children.

On November 21, 2019, Mother spoke to CUA [*via* the telephone and] advised CUA that she was in the process of getting into another treatment program.

On December 26, 2019, CUA visited the family['s] home and saw Father and [the children.] Father advised CUA that he had not made any medical appointments for the children. CUA expressed to Father the importance of ensuring that the children attended their medical appointments.

On January 17, 2020, CUA visited the family['s] home and saw Mother, Father[,] and [the children.] Mother advised CUA that she had been residing in the home for a few days, but her name had been removed from the lease, so she had to be out of the home in ten days. DHS learned that J.G. had been taken for his vaccinations by a family friend.

On February 6, 2020, CUA learned that Mother was admitted to [a Philadelphia hospital] after suffering a miscarriage and hemorrhaging following an attack by Father. CUA was advised that Mother [and the children] would be residing with [a third-party] in New Jersey after Mother was discharged [from the hospital].

On February 19, 2020, CUA learned that Mother [] contacted a family friend and asked that they retrieve [the children] from [the third-party's] home [in New Jersey] because Mother felt that she was unable to care for [the children.]

On February 20, 2020, CUA met with Father[ and the children.] Father denied hitting Mother and stated that she went to the

hospital in an ambulance as a "stunt" in order to kidnap [the children] and take them to New Jersey.

On February 28, 2020, March 2, 2020, and March 4, 2020, CUA attempted to visit the family['s] home[,] however, there was no answer.

On March 9, 2020, CUA visited the family['s] home. Father admitted that [the children] had not attended their medical and dental appointments, and that he had not obtained medical insurance and food stamps for them.

On March 20, 2020, CUA visited the family['s] home. Father advised CUA that he did not know the whereabouts of Mother, and that she had been living at the home for only a day or two at a time. Father advised CUA that Mother was still receiving WIC benefits and food stamps but was not providing food for the children. Father stated that he had lost his job[.] CUA referred him to a local food bank.

On March 26, 2020, CUA spoke to [the children's] paternal aunt[, *via* telephone, and the aunt] stated that she provided food earlier in the week to Father. [The aunt] stated that she was willing to be a resource for the children.

On April 1, 2020, CUA received a telephone message from Mother in which she stated that she had been buying food and supplies for the children. CUA returned Mother's [telephone] call and left a message advising her to give [the children's] medical cards, the WIC card[,] and food stamps to Father.

On April 3, 2020, CUA visited the family's home[] and spoke to Father outside [] the home due to the COVID-19 pandemic. DHS observed that during their conversation an unidentified male walked past them and entered the home and that Father was pacing and having difficulty speaking. Father admitted that he had used marijuana.

On April 8, 2020, [the children] began residing with [their paternal aunt and uncle.]

On April 30, 2020, CUA learned from [the aunt] that Mother visited the children for the first time in two weeks. [The aunt] stated that after Mother left the home, she noticed a bag on the floor which she believed contained drugs.

Mother and Father were not compliant with substance abuse treatment or domestic violence treatment. Mother was not compliant with mental health treatment.

On May 20, 2020, the SCP was revised. The objectives for Mother were to ensure that the children's medical and dental needs were being met and to sign release of information forms so that records can be obtained to ensure that T.G. attended school daily and on time[ and] to ensure that T.G.'s individualized education plan [("IEP")] was updated when appropriate[. Mother was] to participate in [a] drug rehabilitation program[, and once enrolled,] adhere to all recommendations[. Mother was also] to enroll in a mental health treatment program and participate until [the program was] completed.

On July 8, 2020, an adjudicatory hearing was continued, and adjudication was deferred by [the trial court. The] children [currently] reside[d] with their [aunt and uncle] under a safety plan. No action was taken.

On September 28, 2020, the SCP was [again] revised. The objectives for Mother were predominantly the same as the previous SCP.

On September 29, 2020, adjudicatory hearings were held for T.G. and J.G.[ The] children were adjudicated dependent. Legal custody transferred to DHS and placement continue[d] with [the aunt and uncle, with a] referral for Kinship Care. Mother and Father [were granted] supervised visits at [a DHS provided location] with 24-hour confirmation. CUA [was instructed] to assist [Mother and Father] with transportation for visits, if necessary. Mother was referred to [a provider] for a dual-diagnosis assessment and three random drug and alcohol screens prior to the next hearing. [Mother and Father were] referred for domestic violence [counseling.] Mother and Father were referred to the Achieving Reunification Center [("ARC")] for employment and housing services[.] DHS was [instructed] to conduct a parent locator search [("PLS")] for Mother[.] CUA was to make outreach to Father and [] conduct an assessment of his home.

On January 4, 2021, the SCP was revised. The objectives for Mother were predominantly the same as the previous SCP.

On February 11, 2021, a permanency review hearing was held before [a] Juvenile Court hearing officer[. At the conclusion of the

hearing, it was determined that] legal custody [would] remain[] with DHS and placement [would] continue[] in Kinship Care. [Mother and Father were] to have weekly supervised visit[s] at [a DHS provided location] for 2 hours initially[. The] visits [were permitted to] occur either at [a DHS provided location] or in the community, weather permitting, and [] the visits [could] be expanded to occur in the foster home as agreed to and arranged by the children's caregiver. The [trial] court further permitted that one visit monthly, should [the visitation] occur in the caregiver's home, [] be supervised by CUA[.] Mother and Father [were] referred to [a provider] for a[n immediate] drug and alcohol screen[ and a] dual[-]diagnosis assessment, plus three random drug and alcohol screens prior to the next court date[.] The [trial] court further ordered that Mother have a mental health assessment and comply with all recommendations[. The trial] court referred Mother to the Behavioral Health System [("BHS")] for consultation and[] evaluation[.] Mother and Father [were] to participate in domestic violence counseling[. Mother and Father were] referred to ARC[] and were to allow CUA to assess their home[.] CUA was to assess the [] home[ immediately.] CUA was to assist Mother with engagement in mental health treatment.

On June 25, 2021, permanency review hearings were held before the Juvenile Court hearing officer[. At the conclusion of the hearings, it was determined that] legal custody [would] remain[] with DHS and placement [would] continue[] in Kinship Care[.] Mother['s] and Father['s] visits remain[ed] *status quo*. Sibling visits [were permitted so the children could visit with a] newborn sibling. CUA [was instructed] to assist with transportation to visits[.] Attendance for [the] visits [was to] be confirmed 24 hours in advance. The [trial] court determined that [Mother and Father] achieved minimal compliance with [the] permanency plan established for the children. The [trial] court learned that [Mother's and Father's] address had been updated to Vineland, New Jersey. [Mother and Father] were referred to [a provider for an immediate] drug and alcohol screen, [a] dual[-]diagnosis assessment[, and] monitoring, plus three random drug and alcohol screens prior to the next hearing[. Mother and Father were] to comply with all recommendations[. Mother and Father were] to engage in mental health treatment[,] to attend ARC for all appropriate programs[,] and to participate in [a] domestic violence [counseling] program[, as well as] provide CUA proof of completion. [The trial court] further ordered that referrals for drug and alcohol treatment and domestic violence counseling

[were] to be made in New Jersey[,] or as close to [Mother's and Father's] new residence[ as] possible. [Mother and Father] were to ensure that the children's medical and dental needs were met, by signing all appropriate consent forms[.]

On July 21, 2021, the SCP was revised. The objectives for Mother were predominantly the same as the previous SCP.

On December 8, 2021, permanency review hearing[s] were held before the [trial court, which ordered that] legal custody remain[] with DHS[] and placement continue[] in Kinship Care [] with [the paternal aunt and uncle]. Mother achieved minimal compliance with the permanency plan established for the children. Mother [was permitted] to have weekly, supervised visits with the children at the provider agency and to confirm [her] visits 24 hours in advance[.] CUA was to assist Mother with transportation to and from visits. [Mother and Father were] referred to [a provider] for [immediate] drug and alcohol screens[ and] dual[-]diagnosis assessments[, as well as] two additional random drug and alcohol screens to be submitted prior to the next court date[.]

Trial Court Opinion, 7/6/22, at 3-15 (record citations and extraneous capitalization omitted).

On March 25, 2022, DHS filed petitions for involuntary termination of Mother's parental rights to T.G. and J.G. pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). That same day, DHS also filed petitions seeking to change the permanent placement goal for both T.G. and J.G. to a new goal of adoption. Daniel Kurland, Esquire was appointed as guardian *ad litem* to represent the legal and best interests of both T.G. and J.G. John Joseph Capaldi, Esquire was appointed to represent Father, and Susan M. Rubinovitz, Esquire was appointed to represent Mother. DHS was represented by Kira Meibos, Esquire, an attorney with the Philadelphia Solicitor's Office. On May 3, 2022, the trial court conducted a hearing on the

termination petitions and the petitions for goal change, at which the aforementioned counsel participated. Mother and Father were not present for the hearing, despite having received subpoenas to appear. N.T., 5/3/22, at 2 and DHS Exhibit 1.

On May 3, 2022, the trial court found that, with regard to Mother, DHS met its burden of proof under Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Adoption Act as to both T.G. and J.G., and subsequently terminated Mother's parental rights to the children.[6] The same day, the trial court also granted DHS's request to change the permanent placement goal to one of adoption with regard to both T.G. and J.G. This consolidated appeal followed.[7]

Mother raises the following issues for our review:

1. Did the trial court err as a matter of law or abuse[] its discretion where it determined that the requirements of 23 Pa.C.S.A. [§] 2511(a) [were met, permitting the trial court] to terminate [Mother's] parental rights[?]

2. Did the trial court err as a matter of law or abuse[] its discretion where it determined the requirements of 23 Pa.C.S.A. [§] 2511(b) were met[?]

_____

[6] With regard to Father, the trial court found that DHS met its burden of proof under Sections 2511(a)(1), (a)(2), and (b), and subsequently terminated Father's parental rights to the children.

[7] On June 2, 2022, Mother filed concise statements of errors complained of on appeal along with separate notices of appeal at the four trial court dockets pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court subsequently filed its Rule 1925(a) opinion on July 6, 2022.

>     3.     Did the trial court err as a matter of law or abuse[] its
>            discretion where it determined that the permanency goal for
>            T.G. and J.G. should be changed to adoption[?]

Mother's Brief at 3.

We begin by addressing Mother's first and second issues which challenge the trial court's termination of her parental rights pursuant to Section 2511 of the Adoption Act. In matters involving involuntary termination of parental rights, our standard of review is well-settled.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill[-]will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (original brackets omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b)[ - ]determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*B.J.Z.*, 207 A.3d at 921 (citation omitted). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re I.J.*, 972 A.2d 5, 9 (Pa. Super. 2009).

Here, the trial court terminated Mother's parental rights to T.G. and J.G. pursuant to, *inter alia*, Section 2511(a)(1) and (a)(2).[8]  Section 2511(a) provides, in pertinent part, as follows:

## § 2511.  Grounds for involuntary termination

_____

[8] At the termination hearing on May 3, 2022, the trial court stated,

> The evidence, which is clear, convincing, and uncontradicted **supports a finding under [Section] 2511(a)(1) and [(a)](2) and [](b)**[.  T]he evidence under [Section 2511] (a)(1) and [(a)](2) [is] that [Mother and Father] are completely non-compliant, or minimally compliant to [] an extent that its meaningless, and that they, in effect, have abandoned these two children.

N.T., 5/3/22, at 38 (emphasis added).  In its Rule 1925(a) opinion, however, the trial court stated,

> The record clearly established that DHS provided clear and convincing evidence for terminating Mother's parental rights and that termination meets the developmental, physical, and emotional needs and welfare of the [c]hildren and the statutory requirements **pursuant to 23 Pa.C.S.A. § 2511 (a)(1), (2), (5), (8)[,] and [](b)**.

Trial Court Opinion, 7/6/22, at 21 (emphasis added).  The decrees terminating Mother's parental rights to T.G. and J.G. also stated that her rights were terminated pursuant to Section 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). Thus, there is a discrepancy between the trial court's grounds for termination of Mother's parental rights as set forth at the termination hearing and the reasoning set forth in the termination decrees and the trial court's Rule 1925(a) opinion.  Nonetheless, for the reasons more fully discussed *infra*, we find the record supports termination of Mother's parental rights under Section 2511(a)(1).  As such, we need not resolve this discrepancy and our discussion shall focus on Section 2511(a)(1) and (b) as grounds for termination.

**(a) General rule.** - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(1) and (a)(2).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition." *Z.P.*, 994 A.2d at 1117 (emphasis in original). Recently, our Supreme Court in *In re Adoption of C.M.*, 225 A.3d 343 (Pa. 2021) reiterated the well-established principle that "a child has a right to essential parental care" and that, although the Adoption Act does not provide a strict definition of "parental duty" there are "certain irreducible qualities of a parent's attendant obligation." *C.M.*, 225 A.3d at 364. The *C.M.* Court explained that a parent's parental duty includes, *inter alia*, (1) a positive duty of affirmative performance; (2) communication and association with the child; (3) exerted effort to take and maintain a place of importance in the child's life; and (4) exercising reasonable firmness in resisting obstacles placed

in the path of the parent-child relationship. *Id.*; *see also In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021). Obstacles preventing a parent-child relationship include, *inter alia*, "substance abuse, mental health issues, homelessness, joblessness, criminal charges, or a confluence of some or all of these issues[.]" *L.A.K.*, 265 A.3d at 593.

> [E]ven where the evidence clearly establishes a parent [] failed to perform affirmative parental duties for a period in excess of six months, the [trial] court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights.

*C.M.*, 255 A.3d at 364 (citation, quotation marks, and original brackets omitted); *see also L.A.K.*, 265 A.3d at 593. In considering the totality of the circumstances,

> if competent evidence establishes the statutory criteria under [Section] 2511(a)(1), [a trial court is required to consider] three lines of inquiry: (1) the parent's explanation for his or her absence; (2) the post-abandonment contact between parent and child, including a parent's efforts to re-establish contact; and (3) consideration of the effect of termination of parental rights on the child pursuant to [Section] 2511(b).

*C.M.*, 255 A.3d at 365; *see also L.A.K.*, 265 A.3d at 593.

> [A] finding of abandonment, which has been characterized as one of the most severe steps the [trial] court can take, will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship.

***L.A.K.***, 265 A.3d at 592 (citations, quotation marks, and original brackets omitted); ***see also C.M.***, 255 A.3d at 365. "[T]he focus under [Section] 2511(a)(1) is not the degree of success a parent may have had in reaching the child, but examines whether, under the circumstances, the parent [] utilized all available resources to preserve the parent-child relationship." ***C.M.***, 255 A.3d at 365.

Once the trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), the trial court is required to engage in an analysis pursuant to Section 2511(b) to determine whether termination is in the best interests of the child. Section 2511(b) states,

### § 2511. Grounds for involuntary termination

. . .

**(b)  Other considerations.** - The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). The analysis under Section 2511(b)

> focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [Section] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law,

however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [Section] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of J.N.M.*, 177 A.3d 937, 943-944 (Pa. Super. 2018) (citation and original brackets omitted), *appeal denied*, 183 A.3d 979 (Pa. 2018). A trial court may rely on a caseworker or social worker to determine the status of and nature of a parent-child bond. *J.N.M.*, 177 A.3d at 944 (holding, a trial court "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert" (citation omitted)); *see also In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (holding, a trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond" (citation omitted)).

Here, as noted *supra*, the trial court terminated Mother's parental rights to T.G. and J.G. pursuant to, *inter alia*, Section 2511(a)(1), (a)(2), and (b), stating "the evidence under [Section 2511] (a)(1) and [(a)](2) [is] that [Mother and Father] are completely non-compliant, or minimally compliant to [] an extent that its meaningless, and that they, in effect, have abandoned

these two children." N.T., 5/3/22, at 38. In support of its conclusion, the trial

court summarized the evidence as follows:

> [The trial] court heard clear, convincing, and persuasive evidence from [a case manager, who] testified she was assigned to the case on August 24, 2021. She stated the children became known to DHS pursuant to a GPS report dated [June 2019,] alleging that Mother gave birth to J.G.[] and Mother tested positive for marijuana and oxycodone. J.G. also tested positive.
>
> [The case manager] testified Mother stated to DHS that she was prepared to care for J.G. DHS learned another child, T.G., was also in Mother and Father's care. The infant, J.G., was discharged from the [NICU in June 2019,] and was placed with [Mother and Father]. CUA services were implemented in the home on June 21, 2019, and the children were determined to be safe.
>
> DHS subsequently became aware of domestic violence between Mother and Father. [Mother and Father] were not attending any drug and alcohol treatment [programs,] and there were concerns regarding the children missing several medical appointments. [The case manager] testified [that] SCP objectives were established for [Mother and Father that addressed] those [concerns.] The children were adjudicated dependent on September 29, 2020[,] and were placed in Kinship Care with [their] paternal aunt and uncle, where they remain today.
>
> [The case manager] testified Mother's SCP objectives were to ensure the children's medical[ and ]dental needs were met and to sign consent[ forms,] to complete [a] dual[-]diagnosis [assessment], follow recommendations[,] and do random drug screens. Mother [was] to engage in mental health [treatment], attend ARC for parenting, employment, and housing education, participate in [a] domestic violence program[,] and to attend supervised visitation.
>
> [The case manager] testified she referred Mother to ARC for services, but Mother did not attend. Regarding mental health, Mother has not provided any proof of enrollment. Regarding domestic violence counseling, Mother has not provided any proof of enrollment. Mother indicated to [the case manager] that she was going to join a program in New Jersey close to where she lived that covered mental health [treatment], drug and alcohol [treatment,] and domestic violence [counseling]. Mother has not

provided any proof of enrollment, nor did she provide any contact information for the program in New Jersey.

[The case manager] further testified Mother and Father have another infant child, who is six or seven months old, and the family is active with Children and Youth Services in New Jersey[, regarding this infant child]. [The case manager] spoke with [Mother's] New Jersey case [worker,] who informed her that Mother attends domestic violence [counseling] at [a treatment center in New Jersey.]

[The case manager] testified she attempted to verify this information by calling Mother, but [Mother] never answered the telephone call.

Regarding the random drug screens ordered by [the trial] court, [the case manager] testified Mother was referred [to a screening center] but did not comply. Regarding visitation, [the case manager] noted that Mother was offered eight visitations since the last court date, [and] Mother attended two of the eight visits. When questioned [by the case manager], Mother stated she had transportation issues[. The case manager] told Mother to inform her in advance[,] and transportation would be arranged. Mother did not comply with informing her.

[The case manager] testified Mother stated [] that she gave the previous case worker documents, and she gave [the case manager] the same documents, which was proof that she completed [a] drug and alcohol program in July [] 2020. She noted Mother was aware of the SCP objectives because [the case manager] reviewed them with her, and Mother was told she needed to comply with the objectives for reunification. [The case manager] continues to have concerns about the children being with Mother because Mother continues to use drugs. [The case manager] spoke with the case [worker] in New Jersey and learned that all the drug screens they recorded have been positive for drugs. Further, [the case manager] noted Mother has not addressed her mental health objective and has not been consistent with visitation.

[The case manager] testified she [] observed Mother with the children and opined that Mother and T.G. do not have a parent-child bond. T.G. has Downs Syndrome and Mother's interaction with [T.G.] is inappropriate and upsets him. Mother told T.G.[, at first,] that [his paternal aunt] was his aunt, then when [the case manager and Mother] reviewed the SCP objectives

- 20 -

Mother freaked out and told T.G. that [his paternal aunt] was not his aunt and that she [was] not family. T.G. has [developmental] delays and[,] based on Mother's interactions with him, [the case manager] opined Mother does not care that [T.G.] is present when she acts out, and she lost it in front of him. Regarding J.G., [the case manager] opined Mother does not have a parent-child bond with him. She noted that when J.G. comes to visitation[,] he spends time near the door always asking when [his paternal aunt] will return to pick [T.G. and him] up and looks forward to the end of the visits.

[The case worker] testified the children have lived in the current Kinship foster home for two years[,] and the Kinship foster parents are interested in adoption. She testified the children look to their paternal aunt and uncle for love, protection, and support. She opined the children would not suffer irreparable harm if Mother's paternal rights were terminated because [the children] are not bonded to Mother [but, rather,] are bonded with their aunt and uncle. She further opined it would be in the children's best interests to be freed for adoption.

*Id.* at 18-21 (record citations and extraneous capitalization omitted).

A review of the record demonstrates that in April 2020, *vis-à-vis* a family agreement, the children began living apart from Mother and Father and living, instead, with their paternal aunt and uncle. N.T., 5/3/22, at 13-14. The children began residing with their aunt and uncle because Mother and Father "could not control their substance abuse or domestic violence" and they were not attending to the children's medical needs. *Id.* at 14. At that time, Mother's reunification goals, pursuant to her SCP, were, *inter alia*, (1) to ensure that the children's medical and dental needs were being met and all necessary consent forms were provided; (2) to complete a dual-diagnosis assessment, follow any recommendations based on that assessment, and submit to three random drug and alcohol screenings; (3) participate in, and

- 21 -

complete, a mental health treatment program; (4) attend ARC for parenting skills training and employment and housing services; (5) participate in domestic violence counseling; and (6) attend supervised visitation with the children. *Id.* at 16-17.

On September 29, 2020, the children were adjudicated "dependent children," and legal custody was granted to DHS with the aunt and uncle continuing to maintain physical custody pursuant to a Kinship foster care arrangement. *See* DHS Exhibit 2, at 33-34. Over the course of the next year and six months (September 2020 to March 2022), the trial court conducted several permanency review and status review hearings.[9] The outcome of these hearings was, *inter alia*, (1) a continuation of placement of the children with the aunt and uncle; (2) the maintaining of a placement plan of reunification of the children with Mother; and (3) a reiteration of Mother's SCP goals for reunification. *Id.* at 34-41. It was noted at the June 2021 permanency hearing that Mother and Father relocated to Vineland, New Jersey. *Id.* at 38. It was also documented at the June 2021, and the December 2021, permanency hearings that there was "minimal compliance" by Mother in meeting her reunification goals. *Id.* at 37, 40.

---

[9] Permanency review hearings were held on February 11, 2021, June 25, 2021, and December 8, 2021. Status review hearings were held on September 23, 2021, and March 10, 2022, although this last hearing was continued to provide Mother and Father an opportunity "to deliver documents relating to services they have participated in" to DHS. *See* DHS Exhibit 2, at 34-41.

At the termination hearing, the case manager testified that, in the six months preceding the filing of the petitions for termination of Mother's parental rights (September 2021 to March 2022), Mother did not attend ARC for parenting skills education and housing and job assistance. N.T., 5/3/22, at 17. The case manager also stated that Mother did not provide proof that she was enrolled in, or had completed, a mental health treatment program or domestic violence counseling, as required under her reunification plan. *Id.* Mother also did not attend her three random drug screenings as required. *Id.* at 19. The case manager stated that when she questioned Mother about her compliance with these reunification goals, Mother stated she would attend an all-encompassing program, covering drug and alcohol, mental health, and domestic violence services, with a provider in New Jersey, where Mother currently resided. *Id.* at 18. The case manager stated that Mother never provided proof of completion of an all-encompassing program or contact information for the provider. *Id.* The case manager also described Mother as being inconsistent with her involvement in the children's lives, noting that since the March 10, 2022 status review hearing, Mother only attended two out of the eight arranged visitation sessions. *Id.* at 19-20. Mother informed the case manager that transportation was an issue with her attending the visitation sessions. *Id.* at 20. The case manager told Mother that transportation could be arranged with advance notice, but Mother never contacted the case manager about arranging transportation to the missed visitation sessions. *Id.*

- 23 -

The case manager testified that Mother's New Jersey children and youth services case worker informed the case manager that Mother participated in domestic violence counseling services in New Jersey and was involved with a treatment services provider also in New Jersey.[10] *Id.* at 19. The case manager attempted to contact Mother about obtaining proof of Mother's participation in these New Jersey-based programs, but Mother never returned the case manager's inquiries. *Id.* The New Jersey case worker also informed the case manager that Mother tested positive on each test administered for drug use. *Id.* at 22.

Upon review, we concur with the trial court, and the record supports, that Mother abandoned and failed to perform her parental duties with regard to T.G. and J.G. DHS has proven by clear and convincing evidence the statutory criteria under Section 2511(a)(1) for termination of Mother's parental rights to the children. Moreover, despite receiving a subpoena to appear at the termination hearing, Mother did not attend the termination hearing to provide an explanation of her absence from the children's lives. *See* N.T., 5/3/22, at 2, 5-7, and DHS Exhibit 1. We further concur with the trial court, and the record supports, that since abandoning her parental duties in April 2020, and in particular within the six months prior to the filing of the

---

[10] As noted *supra*, Mother and Father were "active" with New Jersey children and youth services related to their infant child, who is not the subject of the case *sub judice*. N.T., 5/3/22, at 18.

petitions for termination of parental rights, Mother has put forth no effort or only minimal effort to maintain parent-child relationships with T.G. or J.G.

Finally, in considering the effects termination of Mother's parental rights would have on the children, as well as the best interests of the children, pursuant to Section 2511(b), the trial court noted that termination of Mother's parental rights would not have an irreparable effect on the children and that it was in the best interests of the children that Mother's parental rights were terminated. Trial Court Opinion, 7/6/21, at 21. Upon review, we concur with the trial court, and the record supports, that termination of Mother's parental rights is in the best interest of the children pursuant to Section 2511(b). The case manager testified that she had opportunities in which to observe Mother interacting with the children, and, in her opinion, neither child had a parent-child bond with Mother. Specifically, the case manager, in describing Mother's relationship with T.G. as unhealthy, recalled an incident where Mother's conduct was inappropriate. N.T., 5/3/22, at 26. On this occasion, Mother falsely told T.G. that his paternal aunt was not his relative and due, in part, to T.G.'s Down Syndrome condition, he became upset and angry. *Id.* The case manager stated that Mother showed little care or concern as to the effect her false statement had on T.G. *Id.* With regard to J.G., the case manager stated that her assessment of the lack of a parent-child bond was based upon her observation that, during visitation with Mother, J.G. would remain "at the door" asking if his aunt were there yet. *Id.* at 27. The case manager testified that the children looked to their aunt and uncle, rather than

Mother and Father, for love, protection, and support. *Id.* at 28-29. The case manager's assessment of the children and the lack of a parent-child bond with Mother was uncontested as Mother failed to appear at the termination hearing, further demonstrating the lack of a loving and supportive relationship with the children.

For these reasons, we concur with the trial court, and the record supports, that DHS has proven by clear and convincing evidence that grounds for termination of Mother's parental rights exists under Section 2511(a)(1) and (b). Consequently, we discern no error of law or abuse of discretion in the decrees terminating Mother's parental rights to T.G. or J.G.

In her third issue, Mother challenges the trial court's order changing the children's permanent placement goal from reunification to adoption. Mother's Brief at 24-28. Mother argues,

> A change in the permanency goal for the [c]hildren is at best premature. T.G. was sixteen years old at the time of the May 3, 2022 hearing, and fourteen years old when removed from Mother. He had a relationship with Mother, who was working on her objectives in New Jersey. Likewise, Mother was developing a relationship with J.G. through visitation. . . . [J.G.] was two years old at the time of the May 3, 2022 hearing. [He] spent several of his first months of life with Mother before moving to his [aunt and uncle's] home in kinship foster care.

Mother's Brief at 24-26, 27.

> In cases involving a [trial] court's order changing the placement goal from [reunification] to adoption, our standard of review is abuse of discretion. To hold the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the [trial] court disregarded the law, or that its action was a result of partiality, prejudice, bias[,] or ill[-]will. While this Court

is bound by the facts determined in the trial court, we are not tied to the [trial] court's inferences, deductions[,] and conclusions[. We] have a responsibility to ensure that the record represents a comprehensive inquiry and that the [trial court] applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations and quotation marks omitted), *appeal denied*, 959 A.2d 320 (Pa. 2008). "[T]he focus of dependency proceedings is upon the best interest of the children and [] those considerations supersede all other concerns, including the conduct and the rights of the parent." *In Interest of L.T.*, 158 A.3d 1266, 1276 (Pa. Super. 2017) (original quotation marks omitted) (stating, "[i]n a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary"); *see also In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (stating, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations, including the rights of the parents" (emphasis in original)). "When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *N.C.*, 909 A.2d at 823. Courts of this Commonwealth have long recognized that "a child's life simply cannot be put on hold in the hope that [a] parent will summon the ability to handle the responsibilities of parenting." *L.T.*, 158 A.3d 1276, *citing N.C.*, 909 A.2d at 824.

Section 6351 of the Adoption Act, governing disposition of dependent children, directs trial courts to systematically conduct permanency hearings "for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved[,] and whether placement continues to be best suited to the safety, protection[,] and physical, mental[,] and moral welfare of the child." 42 Pa.C.S.A. § 6351(e)(1). Section 6351(f) requires the trial court, at each permanency hearing, to determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

(7) If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

(8) The services needed to assist a child who is 14 years of age or older to make the transition to successful adulthood.

(8.1) Whether the child continues to meet the definition of "child" and has requested that the court continue jurisdiction pursuant to section 6302 if the child is between 18 and 21 years of age.

(8.2) That a transition plan has been presented in accordance with section 475 of the Social Security Act (49 Stat. 620, 42 U.S.C.[A.] § 675(5)(H)).

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

(ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

42 Pa.C.S.A. § 6351(f).[11]

Although Mother does not cite to the specific sections of Section 6351(f) that are subject to her challenge, a review of Mother's argument – that the change in the permanency plan to adoption was premature because Mother was working on achieving her reunification goals – demonstrates a challenge to the trial court's findings under Section 6351(f)(2), (f)(5), and (f)(5.1). In granting DHS's request to change the permanency goal to adoption, the trial court explained,

[The trial] court heard credible, persuasive testimony that Mother is not ready, willing, and able to care for [the children]. Paternal

_____

[11] We note that, effective January 2, 2023, criteria 8 and 8.2 will state as follows:

(8) The services needed to assist a child who is 14 years of age or older to make the transition to successful adulthood, **and whether the services are being provided as required under 67 Pa.C.S.[A.] § 7505 (relating to transition plan and services).**

(8.2) **If the child is 18 years of age or older, whether a suitable** transition plan has been presented in accordance with section 475 of the Social Security Act (49 Stat. 620, 42 U.S.C.[A.] § 675(5)(H)) **and 67 Pa.C.S.[A.] § 7505**.

2022 Pa. Legis. Serv. Act. 2022-118 (H.B. 1866) (enacted Nov. 3, 2022, effective Jan. 2, 2023).

aunt and uncle are the pre-adoptive resource for the children and are able to provide safety and permanency for them. It is in [the children's] best interests to be adopted by [their aunt and uncle.]

[The trial] court finds the record sustains the factual findings and legal conclusions that reunification is not feasible and that enough competent[,] clear[,] and convincing evidence exists to change the permanency goals for the children from reunification to adoption.

Trial Court Opinion, 7/6/22, at 22-23 (extraneous capitalization omitted).

Based upon a review of the record, we concur with the trial court, and the record supports, that Mother has not complied with her reunification goals and, as such, it is in the best interest of the children that the permanency goal be changed to adoption. As discussed *supra*, despite requests by the case manager, Mother, who did not attend the permanency hearing on May 3, 2022, did not provide proof of compliance with her reunification goals, including, *inter alia*, that she attended parenting, job, and housing training, participated in, and completed, mental health and drug and alcohol treatment programs, obtained domestic violence counseling, underwent drug screenings, and maintained an active presence in the children's lives. Rather, when asked for proof of documentation about her participation in such counseling and treatment programs, Mother failed to return telephone inquiries or to provide documentation and contact information for the providers. Moreover, Mother has only visited with the children two out of eight times since the permanency hearing on March 10, 2022, and reportedly continues to test positive for drug use. Some of Mother's reunification goals began as part of her SCP in October 2019. Mother voluntarily placed the

children with the children's aunt and uncle in April 2020, because of, *inter alia*, her underlying drug and alcohol problems, and the children were adjudicated dependent in September 2020. Mother's reunification goals, as discussed *supra*, have remained relatively the same for more than 18 months from the time the children were adjudicated dependent until the termination hearing on May 3, 2022. The children currently reside in a stable, loving home with their aunt and uncle who provide them with safety, security, and love. While in the care of the aunt and uncle, the children have maintained attendance at school and daycare facilities and their medical and dental needs continue to be met. We concur with the trial court, and the record supports, that a change in the permanency goal to adoption is in the best interests of the children. While Mother argues that such a change is "premature," the record confirms that Mother has not performed her parental duties and the children's lives simply cannot be put on hold in the hope that Mother may eventually summon the ability to handle the responsibilities of parenting. Therefore, we conclude that the trial court did not commit an error of law or abuse its discretion in changing the children's permanency goals to adoption.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/6/2022